[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Gregoire R. Sideleau (hereinafter "Respondent"), juris number 304724, was admitted to the bar on November 17, 1981. Relevant to this court's determination is that he was previously suspended from the practice of law from April 22, 2000 to October 22, 2000 in the matter of StatewideGrievance Committee v. Sideleau, CV00 037 06 32 S (Skolnick, J.), for failing to act with reasonable diligence, failing to adequately communicate with clients, failing to properly account for funds, and failing to provide an answer to a grievance complaint. Relevant, too, is that he was reprimanded by the Statewide Grievance Committee (hereinafter "Petitioner") on November 17, 2000, in the matter of Sherwood v.Sideleau, Grievance Complaint No. 99-0461, for virtually the same reasons for which he had been suspended.[1]
Here, the Respondent is presented with regard to three (3) matters for which the Petitioner alleges misconduct involving character, integrity, and professional standing and conduct. Each such matter is here addressed.
1. Conservatorship of Janet Colonari
In 1994, the Respondent was appointed Conservator for Janet Colonari, then disabled and receiving social security benefits. He used his client's trust account for the estate until December of 1996 when he opened two (2) accounts at People's Bank solely for the estate. Colonari's social security benefits were sent to the Respondent; he would pay her rent directly to her landlord, bring her money for groceries and other incidental household and personal expenses, pay her utility bills, etc. When he initially became Conservator, Colonari was living in her own home which was in poor repair and had tax liens on it. The City of Bridgeport sold those liens to a private investor for three (3) years; there was one (1) year to redeem the house at an interest rate of 18%. In order to save the house, the Respondent got a private loan of thirteen thousand dollars ($13,000). He then made application for a mortgage of seventeen thousand CT Page 2959-m dollars ($17,000).[2] The Respondent testified the then probate judge advised him to redeem the house and approved the mortgage which was to be paid on sale of the residence or within two (2) years, whichever was earlier. No interim payments were required and the interest rate at payoff was 12%. Because of the cushion the mortgaged amount provided together with Colonari's social security payments of $420 monthly, the household could be run and the Respondent was able to deliver to his client small cash payments as they were requested. His habit was to write himself a check from her funds, cashing the check, and bringing Colonari the cash.[3]
In late 1994 or early 1995, Colonari became a client of the Department of Mental Health ("DMH") and the Respondent, with the help of her counselor at DMH, began looking for another place for her to live since the plan was to sell the house on which there was a small amount of equity. When the closing was scheduled in October of 1996, a private home setting was found for Colonari but she walked out of that place within a day or so of her placement. A new closing date was set for the following month. It was learned that renovations were being made to the Crescent Building in Bridgeport, and once completed, there would be room for another occupant. The Respondent testified he was advised that, if Colonari were legally homeless the remaining apartment would be hers; thus, he took her to Operation Hope, a homeless shelter in Fairfield where she remained until she was moved to the Crescent Building in January or February of 1997. Her home was ultimately sold.
By December of 1997, Colonari's rent was two (2) months behind and the Respondent was advised by the building's administrator that, if the back rent were not paid immediately, she would be evicted. At approximately that time, Colonari's sister, Rita Goldberg, retained the Quinnipiac College School of Law Legal Clinic ("Quinnipiac") to represent Colonari in a motion to remove the Respondent as Conservator.[4] On February 24, 1998, the probate court ordered the Respondent to submit his resignation and a final accounting within forty-five (45) days; the Respondent did neither. On June 11, 1998, the probate court removed him as Conservator and again ordered the Respondent to submit a final accounting — this time within ten (10) days. The Respondent did not do that either. He continued to receive Colonari's social security benefits at least through January of 1999 when Colonari was advised by the Social Security Administration ("SSA") her benefits would be discontinued for her failure to provide them current information it required as part of the continuing disability review process. The Respondent knew of this need for such information but had not provided it. As a result of the efforts of Quinnipiac, however, there was in fact never a lapse in benefits. CT Page 2959-n
In June of 1999, Attorney Stark of Quinnipiac moved the probate court to hold the Respondent in contempt for not yet submitting the final accounting it had ordered be made by April of 1998. At a hearing on the motion in August of 1999, the court gave the Respondent two (2) more weeks. The Respondent submitted an accounting in September of 1999 and then submitted a final accounting on or about January 24, 2000. In that final accounting (Exhibit T), attorney fees of $22,843.48 were claimed. The probate court found a number of discrepancies and ordered they be explained to the substitute conservatrix — which the Respondent did not do. It noted that no itemization of fees in the amount of $4,500 was provided and it scheduled a number of hearings to resolve the accounting — none of which the Respondent attended. It also ordered he restore to Colonari's account the sum of $154.50 contained in a People's Bank money market account closed in February of 1999, which amount was not reflected in the final accounting. He has not yet done that. The amount of $383.46 was shown as cash on hand in the September 1999 accounting, but the amended final accounting of January 2000 did not include such amount. It also ordered that amount be restored. Plaintiff's FF. The court also noted that, in 1997 and 1998, checks totaling $7,589.96 from the ward's account were made payable to the Respondent and that $860 of that amount had memos stating "cash to Janet Colonari." All but that sum — or $6,729.96 — was ordered restored since no explanation was provided. Id. It found a discrepancy of $250 in the HUD statement applicable to the sale of Colonari's house and ordered that amount restored — all within 15 fifteen (15) days of the Order.[5] None of those amounts has yet been restored; no affidavit of closing reflecting the return of these monies to Colonari's account has yet been filed. Significantly, at the hearing before this court, the Respondent, while indicating he would restore certain of those amounts, also testified he "had a problem" with the probate court order because he had in fact made those disbursements to the ward although he never obtained any receipts. Though he stated he was "not indicating I won't restore" the funds, he also testified there was presently pending other litigation which might resolve the matter.[6]
As a result of the aforementioned, Attorney Royal Stark of Quinnipiac filed a grievance against the Respondent. The Respondent did not file an answer to that complaint.
The Respondent's defense before this court was that: (a) Colonari's "homelessness" was a strategic device to get her into a secure and attractive residential setting which also provided her the professional care she required; (b) despite the threat of termination of her Title XIX benefits, there never was in fact any discontinuance; and (c) his CT Page 2959-o handling of her account was not as a result of an intent to profit financially but as a result of his own emotional inability stemming from his depression over a failed marriage and his separation from his adolescent daughter who returned to Virginia to live with her mother after a judgment of dissolution.
It must first be said that it was only through Quinnipiac's intervention that Colonari's benefits never lapsed. It was Quinnipiac's providing of information regarding Colonari's continuing schizophrenia that resulted in the continuation of benefits. To be sure, the Respondent had been suffering from depression for a lengthy period. Married in 1987, he moved from Virginia in 1993; his wife and daughter moved here in 1995 to try to make the marriage work. The couple separated in 1996 and the wife returned to Virginia in June of 1996. In June of 1998, the divorce became final. The ex-wife testified the Respondent became angry and depressed after the separation and that he made frequent trips to Virginia to visit. She stated that, when she first came to Connecticut, the Respondent worked very long hours. It was clear she resented the intrusion of his professional responsibilities into their family life and that she never fully accepted his use of personal time to perform such tasks for Colonari as grocery shopping and banking and bringing her money as she and her daughter sat home alone in Connecticut at some distance from family and friends. She described the Respondent as "honest" and said that, in the last couple of years, her ex-husband was less angry, not apparently depressed, and seemingly healthy. The court found Gabriella Sideleau very credible but incompetent to evaluate the Respondent's mental health. The Respondent testified that, when his wife and child moved out in the spring of 1996, he was in a "constant state of agitation," was "seriously depressed," got no sleep, and was drinking and smoking though he stated his practice was not affected in 1996 ("I was dragging but functioning"). Once served with divorce papers, he became worse and could not concentrate on details or work on certain files — of which Colonari's was one; in his own words, certain files were "toxic." He admitted to keeping no time records regarding work done for Colonari in 1994 or 1995; thus, his representation to the probate court that he did fifty (50) hours work in 1994 and fifty (50) hours work in 1995 was no more than an "estimate" arrived at two (2) years after the fact. Exhibit 2. In the summer of 1997, he began psychological counseling and he returned again to that psychologist in 1998 for approximately one (1) year. He admitted to "ducking" probate court deadlines. By his own account, he served Colonari well in the period 1994-1996 but did not do well by her for the period 1997-1999. He now recognizes he should have "stepped away" once Colonari moved to the Crescent Building in early 1997. Instead, he avoided every opportunity to be relieved of his obligations to her. CT Page 2959-p
Rule 1.15 of the Rules of Professional Conduct addresses the safekeeping of clients' property. Subsection (b) reads:
Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
The accountings submitted to the probate court failed properly to reflect the receipt and distribution of funds belonging to Colonari. The Respondent failed to return to Colonari funds which were hers in the absence of any explanation to the contrary. Such conduct was in violation of this rule.
Rule 1.3 of the Rules of Professional Conduct provides, "A lawyer shall act with reasonable diligence and promptness in representing a client." In failing to respond to inquiries of the SSA regarding Colonari's medical and financial status, in failing also to respond to similar inquiries by Quinnipiac, in failing to submit timely accountings as ordered by the probate court, and in failing timely to pay her rent which threatened her eviction, the Respondent violated this rule.
Rule 8.4(4) of the Rules of Professional Conduct provides it is misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." It was a violation of this rule to repeatedly fail to submit final accountings and to fail to attend hearings frequently continued for the purpose of permitting the Respondent to defend against the contempt motion brought by Quinnipiac.
Practice Book Section 2-32(a) (1) requires a lawyer to respond to a grievance complaint "within thirty (30) days of the date notification is mailed to the respondent unless for good cause shown such time is extended by the grievance panel" to which the complaint was forwarded. The failure to make any response to Quinnipiac's grievance was to violate this requirement.
2. Overdrafts
On September 14 and September 17 of 1999, People's Bank notified the Committee the Respondent's client trust account was overdrawn. File number ON-0154-99 was assigned to these overdraft notifications. CT Page 2959-q Statewide Bar Counsel wrote the Respondent on September 20 and 30 of 1999 requesting an explanation; the Respondent answered neither letter. On October 18, 1999, Statewide Bar Counsel filed a grievance complaint (No. 99-0361) pursuant to Rule 9(B) (2) of the Committee's Rules of Procedure for the Respondent's failure to file a response to the letters requesting an explanation. The Respondent filed no answer to the grievance complaint.
The overdrafts occurred when the Respondent used funds in his client trust account for another client, the Loyal Order of Moose, to pay himself for legal work done for still another client whom he expected would soon pay him for wills he had drawn. When he tendered a check made payable to the Loyal Order of Moose and that check was cashed, the clients' trust account became overdrawn. That overdraft and a subsequent overdraft fee charged by People's Bank were the basis of the notifications in file number ON-0154-99. Because the Respondent did not thereafter immediately deposit funds in the account, there was never a positive balance restored and, as a result, other checks presented for payment on that account were dishonored and additional overdraft fees were imposed. The Respondent deposited $3,050 in the clients' trust account on September 23, 1999, but that amount was insufficient to restore a positive balance; that status caused the overdraft notification in file number ON-0157-99. At the statewide grievance panel hearing, the Respondent's explanation was as above stated. Before this court, however, he testified he had misplaced a deposit check in the amount of $3,000 and thus never made the deposit. He testified he "didn't recall" the explanation given at the grievance hearing — or, if he did so testify before that panel, it was that he was "confused" because he was then heavily medicated as a result of kidney stone attacks he was experiencing. This court finds more credible the earlier explanation believing that, if he knew he had misplaced a check, he would simply have voided that check in his checkbook and have written out another check for deposit.
As above stated, Rule 1.15 of the Rules of professional Conduct addresses a lawyer's obligation to keep safe property of a client or another in his/her possession. Rule 1.15(a) reads:
A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the CT Page 2959-r lawyer and shall be preserved for such period of time as may be required under applicable law after termination of the representation.
Practice Book § 2-27(a) provides:
Consistent with the requirement of Rule 1.15 of the Rules of Professional Conduct each lawyer or law firm shall maintain, separate from the lawyer's or the firm's personal funds, one or more accounts accurately reflecting the status of funds handled by the lawyer or firm as fiduciary or attorney, and shall not use such funds for any unauthorized purpose.
In paying himself a legal fee for work done for one client with funds belonging to another client, the Respondent violated both Rule 1.15(a) and Practice Book § 2.27(a).
Rule 8.1(2) of the Rules of Professional Conduct provides that, in connection with a disciplinary matter, a lawyer shall not ". . . knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority . . ." The Respondent's failure to respond to the Petitioner's request for information regarding the overdrafts is a violation of this Rule. His failure to answer the grievance complaint violates both Rule 8.1(2) and Practice Book §2-32(a) (1).
3. LoSardo Matter
In May of 1997, Annette LoSardo and the Respondent entered into a written retainer agreement whereby the Respondent agreed to represent her in a personal injury case arising out of a November 1996 motor vehicle accident. Exhibit W. Although no physical injuries resulted, Mrs. LoSardo was dissatisfied with the repair of her motor vehicle and her dealings with the insurance carrier over the repair issue resulted in emotional upset which required six (6) counseling sessions with a psychologist. The Respondent drafted a complaint (Exhibit X) which he filed in court and sent a copy of the same to LoSardo. The check he sent to the court for the filing fee was not honored by the bank and the New Haven Superior Court sent the Respondent a bad check notice, Exhibit Z, the date of which is illegible. Another bad check notice was sent by the court on March 31, 1998. Exhibit Y. Though the Respondent testified the two (2) notices were in reference to two (2) checks he had sent the court for the filing fee, both notices referenced his check no. 1940. The Respondent never sent a good check and, on April 15, 1998, the court (Silbert, J.) dismissed the case for failure to pay the entry fee and the Respondent never brought another suit. The Respondent testified he did not learn of CT Page 2959-s the dismissal until some time later when he noticed the deposition of the defendant driver and was told by the defense lawyer the case had been dismissed.[7] The statute of limitations ran on plaintiff's action in November of 1998. The Respondent never advised her of the dismissal; she believed her case continued to pend and she believed she had a valuable claim because the Respondent had told her it could be worth as much as $300,000 and that the court "could even double it." He admitted he talked to LoSardo intermittently but never told her the truth. Again, he testified to having "misplaced a check." Asked why he did nothing to rectify the situation, he responded he could not bring himself to deal with it and that he could not work on this file without having "panic attacks." In the meantime, LoSardo testified she called him at least twice weekly to learn the status of her case but was most often unable to talk to him and thought the last time she was able to speak with him was in 1999. On the infrequent occasions when he took her calls, he would tell her that he was doing everything possible to "get it into court" but could not "get it scheduled." It was not until approximately July of 2000 when she went to the Respondent's office that she was told by another lawyer with whom he shared space that the Respondent had been "disbarred."[8] On August 24, 2000, she filed a grievance complaint (no. 00-0161) to which the Respondent never filed an answer.
The Respondent's failure to respond to her grievance complaint was a violation of both Rule 8.1(2) and Practice Book § 2-32(a) (1). His failure to prosecute LoSardo's case was a violation of Rule 1.1 which provides, "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Rule 1.4(a) states, "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." The Respondent's failure to tell Ms. LoSardo of the status of her case and to advise her of her options once having learned of the dismissal is a violation of this rule. His failure to pursue her case with reasonable diligence and promptness violated Rule 1.3 which obligated a lawyer to do so. His active misrepresentation to her regarding the status of her case is a violation of Rule 8.4(3) which provides it is misconduct for a lawyer to "engage in conduct invoking dishonesty, fraud, deceit or misrepresentation."
A trial court faced with an attorney guilty of misconduct has "inherent judicial power, derived from judicial responsibility for the administration of justice, to exercise sound discretion to determine what sanction to impose in light of the entire record before it." StatewideGrievance Committee v. Spirer, 247 Conn. 762, 781 (1999). Connecticut courts have often been guided in the task of evaluating a lawyer's CT Page 2959-t character and fitness to practice law and, thus, the appropriate sanction to impose for misconduct by the ABA's Standards for Imposing Lawyer Sanctions ("Standards"). Section 3.0 of those Standards provides that, after a finding of lawyer misconduct, a court should consider the following factors: (a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the misconduct; and (d) the existence of aggravating or mitigating factors.
In each of these matters, the Respondent has violated a duty owed to his client. In each such instance, he breached professional duties arising out of ethical rules, agency law, and the terms of his contractual relationship with them. There was a demonstrable lack of diligence in his handling of the Colonari and LoSardo matters. The injury to LoSardo caused actual damage — her loss of a remedy. He was dishonest in never disclosing the actual status of her suit and in telling her the court would not schedule her matter. Actual damage in the case of Ms. Colonari is less obvious since her social security benefits were never discontinued and she was never "homeless." Though there was a claim before this court that Colonari lost television service and a newspaper subscription for nonpayment of bills, there was in fact no evidence of the same. As a result of the Respondent's poor record keeping, it cannot be said with any certainty whether amounts for which he billed her for services were excessive though they were in some instances speculative. Monies ordered restored have not been returned to her account — thus, there is in fact actual loss. The potential for more serious injury would, however, have been realized if, for example, Quinnipiac had not stepped in to provide the SSA information it required to evaluate her status and continue disability payments. The Respondent cannot avoid responsibility because another stepped in to pay back rent and to preserve her occupancy at the Crescent Building and her Title XIX benefits. With regard to the Loyal Order of Moose, the Respondent's misappropriation of their funds for his personal use without their knowledge or assent was a violation of the client's trust and caused direct injury to that client. The Respondent violated duties owed the legal system which he, as a member of the bar, swore to uphold and to serve when he flagrantly failed to respond to orders of the probate court and failed repeatedly to attend hearings. His failure to respond to grievance complaints or requests for information from the Committee was to thwart the objectives of the body whose function it was to uphold the standards governing the legal profession. Lawyers are officers of the court; the public rightfully expects they will abide by the substantive and procedural rules affecting the administration of justice.
The Respondent's mental state is clearly relevant here. The court is satisfied that, despite his ability both to discharge competently some CT Page 2959-u professional responsibilities owed other clients and to live an apparently normal life in the society of others during the same period, he was in fact experiencing a significant depression resulting from the breakdown of the marriage, the physical separation from his daughter, and the isolation which followed the marital separation and ultimate divorce. Medical documentation of his mental state was provided the court. Likewise, the court is persuaded the Respondent's failure to address his clients' needs as here chronicled and to accept the responsibility of admitting his misconduct both to his clients and to disciplinary bodies were largely the result of physical and mental incapacitation caused by his mental condition. That cannot be viewed as justification but rather a consideration which may effect the sanction imposed. Rule 9.32 of the Standards lists a number of factors which may be considered in mitigation. Those applicable here are: (a) absence of a dishonest or selfish motive[9] and (b) personal or emotional problems as here discussed. Rule 9.22 enumerates factors to be considered in aggravation so as to justify an increase in the degree of discipline imposed. Applicable to this Respondent's conduct are the following aggravating factors: (a) prior disciplinary offenses; (b) a pattern of misconduct; (c) multiple offenses; (d) vulnerability of victim (as in the case of Ms. Colonari); and (e) substantial experience in the practice of law. Refusal to acknowledge the wrongful nature of conduct is another listed aggravating factor. While the Respondent admits to some of the claimed misconduct, he clearly believes he was powerless to do anything about it as a result of his inability to focus on matters he considered taxing or time consuming or impossible to accomplish because of his emotional disability. Never during the two (2) days of testimony did the Respondent ever acknowledge the severity of his lapses or their effects on his clients nor did he ever express remorse. Equally disconcerting to this court is the Respondent's apparent indifference to making restitution (in Colonari's case) and his continued refusal to respond to lawfully imposed court orders. Specifically, he has failed to restore to Colonari's account monies that the probate court ordered returned and testified he continues to "have a problem" with that order because, despite his inability to demonstrate disbursements he states he made to her, he continues to insist he did in fact make them. When asked by his counsel whether he thought his failure to restore those funds reflected upon his current fitness to practice law, his response was that it did not because he thought "the matter would be dealt with here." The court finds that response disingenuous in view of other testimony that there was pending litigation brought by Colonari's estate against him and a bonding company "concerning this matter" and that he was "not indicating I won't restore." The Respondent is not unwilling to ignore court orders and to deprive a former client of funds that court has determined ought be restored if his failure to do so serves his advantage in as yet CT Page 2959-v unresolved litigation. That effrontery is unacceptable in an officer of the court and is telling of his present incapacity to practice despite the testimony of other witnesses whom he has served well.
Attorney disciplinary proceedings are "for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them." Statewide Grievance Committee v. Spirer, 247 Conn. 762,772 (1999) (citations omitted). When a court disciplines an attorney, it is not to punish that practitioner but so that "the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession." Id. Such discipline should also serve to discourage other practitioners from a similar pattern of misconduct as here demonstrated as well as to encourage those suffering from depression or other incapacity to seek help before clients are disserved and harm is incurred.
Having heard and carefully considered all of the testimony, having examined all of the exhibits, and having carefully considered the recommendation of the Petitioner,[10] this court concludes the Respondent is not presently able to continue in the practice without putting at risk those he undertakes to serve and that he is in need of further psychiatric treatment which hopefully will give him greater insight into the nature and extent of his impairment; thus, the need to put into place conditions to assure his continued recovery.
The Respondent is suspended from the practice of law for eighteen (18) months effective May 1, 2003 through November 1, 2004. He shall continue in psychiatric treatment for the entirety of that period unless medically discharged and such provider shall provide the Petitioner quarterly reports of his progress. He shall register for and pass either the Multi-State Professional Responsibility Examination or a course on legal ethics offered by an accredited law school or other entity acceptable to the Petitioner. No recommendation having been made with regard to the question to whom the Respondent's files shall be entrusted, the appointment of such person is deferred until such recommendation is made to the court.
B.J. SHEEDY. JUDGE